**Opinion issued April 7, 2026**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-25-00847-CV**

———————————

## IN THE INTEREST OF B.M.W. AND L.L.W., CHILDREN

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-02724J**

---

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's order, entered after a bench trial, terminating her parental rights to her minor children, B.M.W. and L.L.W. (collectively, the "children"),[2] and awarding appellee,

---

[1]     *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

[2]     The children are twins.  They were nine years old when mother's parental rights were terminated.

the Department of Family and Protective Services ("DFPS"), sole managing conservatorship of the children.[3]  In two issues, mother contends that the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being,[4] she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being,[5] and termination of her parental rights was in the best interest of the children.[6]

We affirm.

## Background

DFPS filed a petition seeking termination of mother's parental rights to the children and managing conservatorship of the children.

### *Removal Affidavit*

The trial court admitted into evidence a copy of the affidavit of DFPS investigator Koliqwa Burton.  Burton testified that on October 26, 2023, DFPS received a referral alleging physical neglect of the children.  The referral alleged that

---

[3]    The trial court also terminated the parental rights of the children's alleged fathers, but they are not parties to this appeal.

[4]    *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

[5]    *See id.* § 161.001(b)(1)(E).

[6]    *See id.* § 161.001(b)(2).

the children had reported that the "electricity and water [were] broken in their home." Also, B.M.W. was frequently dirty when he arrived at school and "distraught [if] he miss[ed] breakfast at school." The children "were both repeating [the] first grade due to numerous absences."

Burton further testified that DFPS received a second referral alleging physical neglect of the children. The second referral alleged that "the children [were] filthy and [were] seen wearing the same clothes daily." Additionally, L.L.W. would "wet herself[,] and when cleaned[,] [she] had feces in her vagina." She had also been seen wearing an adult diaper. According to the referral, the children's home was "boarded up" and did not have working utilities.

DFPS received a third referral alleging physical neglect of the children as well as physical abuse of B.M.W. by an unknown perpetrator. The referral alleged that law enforcement officers were dispatched to mother's home after her "significant other walked into [a] room and thought that mother and the children were deceased or not breathing." After officers arrived at the home, they found that the front door was blocked by a dresser, and mother yelled at the officers to "stay out of the home." Mother fought with law enforcement officers and was arrested.

According to the referral, the condition of the home where mother and the children were found was "horrible," and there was fecal matter and feces "all over/around the home." (Internal quotations omitted.) The home did not have

3

electricity. A cup of urine was found in a room where "the children may [have been] sleep[ing]." B.M.W. reported that "his aunt tie[d] him up with a leash on his hands and legs" and did "stuff to him." (Internal quotations omitted.)

The removal affidavit stated that another DFPS investigator spoke to a law enforcement officer who went to mother's home on November 28, 2023—the day the third referral was received. The officer reported that the home was in deplorable condition. There was "[f]ecal matter spread over the floors, walls, and even on some furniture." "The sight and smell were overwhelming." Further inspection revealed a "considerable amount of human fecal matter . . . in the bathtub." There was also no running water or electricity in the home.

Burton explained in her affidavit that she met the children on November 28, 2023, and the children's clothing smelled of urine. The children's clothing was also filthy and unkempt, and their hair was tangled. During her conversation with B.M.W., he reported that his aunt had restrained him "using leashes meant for their pet dogs, tightly wrapping them around his legs." She also "made him wear boxing gloves filled with water, weighing down his hands." The incident left marks on his arm and legs.

Burton further testified that during her investigation she spoke to the children's school counselor who informed her that when she visited the children's home, there were no lights in the home and an outside window was "busted." The

4

school counselor described B.M.W. as "bubbly" and L.L.W. as "a reserved young lady."

***Officer Shaw***

Houston Police Department Officer J. Shaw testified that in 2023, he responded to a "disturbance call" at a home in the early morning. The condition of the home was "very bad."[7] To Shaw, it "looked as if it may be an abandoned home," so he was surprised to find people inside the home. The inside of the home smelled "very bad of urine[] [and] feces." "The home was in complete disarray. There was mold[]. Pieces of the flooring weren't . . . intact. There w[ere] roaches everywhere . . . ." Bottles of urine were found in the bedrooms. None of the rooms in the home were clean, and they all contained feces.

According to Officer Shaw, the children were in the home, and mother was sleeping in bed with B.M.W. The bedroom where mother and B.M.W. were located had "urine bottles next to the bed and on the stand," and there was "stuff everywhere." The room was "in complete disarray."

When law enforcement officers encountered mother, she was "[v]ery erratic." She did not want officers "in her home" or "in that room." She yelled at the officers and assaulted some of the officers. The children were present while such behavior was occurring. Law enforcement officers arrested mother.

---

[7] Photographs showing the condition of the home were admitted into evidence.

5

The children were then taken to the hospital because they appeared to have "bite marks" on them and because of the condition of the home. B.M.W. told Officer Shaw that "there w[ere] times where . . . a[] . . . person . . . would hold him in a bathtub with his hands behind his back." Shaw believed that mother and the children were living at the home where they were found by officers because they were asleep in the bedroom.

### DFPS Investigator McClinton

Tonya McClinton testified that she was one of the DFPS investigators who investigated the allegations involving the children. McClinton came into contact with the children on November 28, 2023 at Texas Children's Hospital after receiving a call from law enforcement officers. The children had been brought to the hospital "to be checked out to see if they had any bruises or markings for [a] welfare check." The children's clothes were dirty and had holes in them. The children had been "wearing them for a couple of days [based on] the odor . . . that [McClinton] smelled on them." It appeared that the children had not bathed recently, and when McClinton wiped them down, there was "dirt residue on the towel." McClinton gave the children a bath at the hospital. The children told McClinton that they lived at the address where they were found by law enforcement officers.

### *DFPS Caseworker Pancham*

DFPS caseworker Dimitrios Pancham testified that he was assigned to the children's case. As to mother, Pancham stated that he had visited her current home. Upon arrival, Pancham observed a package from a marijuana dispensary on the front porch, which smelled of marijuana. The home had two bedrooms. Mother's male roommate was living in the living room. Mother lived in one of the bedrooms, and the other bedroom appeared to have "excess stuff" in it. It was "not formable for a sleeping arrangement for two children that [were] both nine years old." Mother had not provided Pancham with a lease agreement for the home where she was living.

Mother told Pancham that she did "odd jobs for a family" and "g[ot] paid in cash." She also told him that she was going to start "DoorDashing," but Pancham had not seen confirmation of that.

During the pendency of the case, mother tested positive for marijuana, cocaine, and methamphetamine use. Mother participated in a substance abuse assessment. Mother also completed her psychological evaluation and individual therapy as well as her parenting classes.

As to mother's criminal history, Pancham stated that mother had previously been incarcerated for the offense of failure to register as a sex offender.

According to Pancham, mother had not addressed the reasons that the children were removed from her care and had not taken any accountability for the children's

removal. Mother had not shown stability in housing; mother refused to disclose where she was living until just recently before trial. Mother had also been incarcerated for a period of time during the case.

Additionally, mother had not provided proof that she could take care of herself or the children financially or that she could keep the children safe.[8] Mother's roommate had only recently entered her life, and little information about mother's roommate had been provided to DFPS, so DFPS was unable to determine if it was safe for the children to live in a home with him. Mother had not provided DFPS with information on her roommate which would allow DFPS to run a background check on him. DFPS was concerned that if the children were returned to mother's care they would be endangered emotionally or physically.

Pancham further testified that mother had four in-person visits with the children during the case as well as virtual visits. During the virtual visits that Pancham had observed, mother acted appropriately, but he noted that she had hung up on the children during one call because B.M.W. was crying and she told Pancham, "I'm not dealing with this." Mother had missed certain scheduled visits with the children during the case.

DFPS's goal for the children was for them to be adopted by their foster mother, which according to Pancham, would allow the children to have a normal

---

[8] Mother brought clothing to a visit with the children one time during the case.

childhood. The children's foster mother also had custody of the children's younger sibling, and she was meeting the children's emotional and physical needs. Pancham had visited the children in their placement with their foster mother, and the children seemed happy. The children were doing well academically in their new school, but they were a grade behind in their schooling.

Pancham acknowledged that mother missed the children, and the children missed mother.

### *Mother*

Mother testified that she had seven children, but none of them currently lived with her. While the children were in her care, they did not attend school regularly. When the children entered DFPS's care, they were not enrolled in school, but mother was trying to get them enrolled in a different elementary school. Mother was not aware that the children were struggling in school.

According to mother, before the children entered DFPS's care, they lived at mother's sister's house and were well taken care of. They were clean and ate well. The home was clean. Mother did not stay at her sister's home with the children.

Mother further testified that on November 28, 2023, law enforcement officers came to a home belonging to a family friend. Mother stated that neither she nor the children lived at the home where they were found on November 28, 2023. Instead, mother had used the address for the home to enroll the children in their prior

9

elementary school. Mother explained that she would drop the children off at the family friend's house in the morning and the friend would take the children to school. Mother would then pick the children up in the evening from the house after she was done with work and take them to her sister's home. According to mother, in November 2023, she lived "on the streets" and slept at a bus stop, and the children stayed at mother's sister's home.

As to November 28, 2023, mother explained that the children were at the family friend's home because the family friend had removed the children from mother's sister's home and brought them to the house. Mother went to the family friend's house because her boyfriend was there at the time. Mother agreed that the family friend's house was filthy. She also stated that she was asleep at the family friend's home in a bed with B.M.W. when law enforcement officers arrived.

After law enforcement officers came to the house, mother threatened her ex-boyfriend because he had called the officers, and she was arrested for "retaliation." Mother ultimately pleaded guilty to the offense of terroristic threat and spent several months in jail. Mother noted that she had previously been incarcerated for the offense of "[i]ndecency with a minor,"[9] and she had been incarcerated two

---

[9] Mother explained that she was eighteen years old when she was charged with the offense of indecency with a child, and the complainant was thirteen years old.

other times for not "up-to-dating [her] address." Mother was required to register as a sex offender.

Mother also testified that she received a Family Service Plan ("FSP"), which she signed. Mother stated that she had completed her parenting classes. Her FSP also required her to provide support for the children, and she did that by bringing them something to eat when she had an in-person visit with them. Mother acknowledged that she tested positive for narcotics use during the case, but she stated that she never missed one of her narcotics-use tests and she did not use narcotics. Mother believed that she tested positive for marijuana use because she had been around her cousin who smoked marijuana, and she tested positive for cocaine use because she slept with a man who handled cocaine or because she had been "smoking vapes." The testing company could have also lost her hair and replaced her hair with the hair of "other people."

Mother noted that she was currently living in a two-bedroom house with a male roommate.[10] Mother's name was not on the lease agreement. Mother slept in one bedroom, and her roommate slept in the living room. Mother paid $450 for rent and for groceries, and her roommate paid the remainder of the rent and for "everything else." Mother had known her roommate for about a year and a half. He would not discipline the children if they were returned to mother's care.

---

[10] Mother stated that she had also lived at a motel during the case.

11

Mother was employed by DoorDash and "pick[ed] up food and drop[ped] it off." She could set her own work schedule. She stated that she lacked a support system and was "on [her] own."

According to mother, the children were currently living with one of her cousins, who was also caring for one of mother's other children. Mother agreed that the children deserved to live in a clean and stable home. Mother did not believe that her sister, with whom the children previously lived, would be a good placement for the children because of her "background and criminal history and stuff like that."

Mother stated that the children loved her and appeared happy to see her during their virtual visits. Mother had two or three in-person visits with the children since they entered DFPS's care. Mother acknowledged that she had hung up on the children during one virtual visit because B.M.W. was upset and that made her feel upset so she hung up. Mother believed that the children wanted to live with her.

### Mother's Criminal History

The trial court admitted into evidence a copy of a trial court judgment showing that on April 22, 2005, mother pleaded guilty to the second-degree felony offense of indecency with a child,[11] and her punishment was assessed at confinement for two years. The trial court also admitted into evidence a copy of a trial court judgment showing that on January 23, 2025, during this case, mother was convicted of the

---

[11] See TEX. PENAL CODE ANN. § 21.11(a), (d).

12

misdemeanor offense of terroristic threat[12] and her punishment was assessed at confinement for ten months.

### Narcotics-Use Testing Results

The trial court admitted into evidence copies of mother's narcotics-use testing results showing that on April 16, 2024, mother tested positive for marijuana use by hair-follicle analysis; on October 10, 2024, mother tested positive for methamphetamine use by hair-follicle analysis and for marijuana use by urinalysis; on January 17, 2025, mother tested positive for marijuana and cocaine use by hair-follicle analysis and marijuana use by urinalysis; on February 24, 2025, mother tested positive for marijuana use by urinalysis; and on April 17, 2025, mother tested positive for marijuana and cocaine use by hair-follicle analysis.

Mother tested negative for narcotics use on April 16, 2024 by urinalysis, on March 12, 2025 by urinalysis, on March 28, 2025 by urinalysis, on April 17, 2025 by urinalysis, and on April 30, 2025 by urinalysis.

### Mother's FSP

The trial court admitted into evidence a copy of mother's FSP dated February 7, 2024. As to the children, the FSP stated that they were "behind in school and

---

[12] *See id.* § 22.07. The indictment alleged that on November 28, 2023, mother intentionally and knowingly harmed and threatened to harm, the complainant, a law enforcement officer, "by an unlawful act, namely an assault, in retaliation for and on account of the service and status of [the complainant] as a public servant."

ha[d] to repeat the 1st grade again" because mother did not take the children to school on a consistent basis. DFPS was concerned about mother's ability to safely and appropriately parent the children and her ability to meet their basic educational, emotional, and medical needs. The children suffered neglect while in the care of mother.

Mother's FSP required her to, once released from jail, demonstrate the ability to provide for herself and the children. Mother needed to find and maintain legal and verifiable employment, and she was required to provide the children with child support during the pendency of the case, such as by providing the children with clothes, shoes, age-appropriate toys, and their favorite foods.

The FSP also required mother to participate in a substance abuse assessment and follow its recommendations, including substance abuse treatment and therapy. Mother was required to participate in random narcotics-use testing, and if she failed to attend a narcotics-use test, then the result was a deemed positive.

Further, mother needed to complete a psychological evaluation and follow all its recommendations, and mother needed to successfully complete parenting classes. Mother also needed to participate in individual therapy to "understand her role and responsibility in the current [DFPS] . . . case" and to educate herself "on how her neglect towards [the] children could have [an effect on] them in the future."

14

Additionally, mother was required to attend all court hearings, permanency conferences, family visits, and scheduled appointments. She was to refrain from engaging in any new criminal activity and from associating with people who participated in criminal activity.

***Permanency Report***

The trial court admitted into evidence a copy of a DFPS permanency report from April 2025. At the time of the report, the children were nine years old and living with a relative, with whom they had been living since November 2024. The relative also had custody of the children's younger sibling.

As to B.M.W., the permanency report described him as a child who was comfortable being the center of attention. He liked playing with his sister. He also liked to play with cars and to play Fortnight, Roblox, and soccer. He loved dinosaurs and dragons. He was an overall happy and energetic kid. He said that he wanted to "be in the Army, a boss, [a] [r]ockstar, and a football player when he gr[ew] up."

At the time B.M.W. entered DFPS's care, he was behind in school because he had to repeat the first grade. While in the care of mother, B.M.W. did not attend school regularly. When he entered DFPS's care, B.M.W. could not count or spell his name. At his current school, he received tutoring services. He also had a paraprofessional in the classroom to assist him with reading and math.

15

As to L.L.W., the permanency report stated that she was "somewhat of a bully to her brother [because] she [was] bigger than him in size." L.L.W. also had "issues with stealing things in the home[,] including food[,] which she ha[d] been caught with in her room." L.L.W. was outspoken, social, and outgoing. She liked art activities and being the center of attention. She also liked unicorns, Barbie dolls, and Barbie houses. She was "curious about her environment and love[d] to find out things for herself." She was independent.

At the time L.L.W. entered DPFS's care, she was behind in school because she had to repeat the first grade as she did not attend school regularly while in mother's care. L.L.W. could not count or spell her name. L.L.W.'s school provided her with tutoring services and a paraprofessional in the classroom to assist her with reading and math. L.L.W. continued to struggle in school but had shown improvement with the assistance of her foster mother and teachers.

As to the children's placement, the permanency report stated that the children's foster mother was taking care of their needs. The children had a check-up with their pediatrician on April 14, 2025 as well as a visit to the dentist on that date. The children attended therapy twice a week. B.M.W. talked to his therapist about his days at school and how he was doing in school. His therapist discussed behavioral issues with B.M.W. that had been reported by school staff. B.M.W. had been diagnosed with Attention-deficit/hyperactivity disorder ("ADHD") and

16

prescribed medication. L.L.W. was working with her therapist on being able to express her emotions better. L.L.W.'s therapist discussed skills for "accepting [being told] no" so that L.L.W. could make better choices. L.L.W. had also been diagnosed with ADHD and prescribed medication.

As to mother's progress with the requirements of her FSP, the permanency report stated that mother did not have a source of income at the time the report was completed. Mother also had not provided any support to the children. Mother completed a substance abuse assessment on April 22, 2024, and she was reassessed on January 25, 2025. After completing her substance abuse assessment, mother "had a disagreement with the provider and was asked by the provider to not come back until her attitude calm[ed] down." Mother tested positive for narcotics use on April 16, 2024, October 10, 2024, January 17, 2025, and February 24, 2025. Mother refused to submit to narcotics-use testing on November 14, 2024 and on February 18, 2025. Mother tested negative for narcotics use on March 12, 2025 and March 28, 2025 by urinalysis.

Additionally, mother completed her psychological evaluation, which recommended that mother participate in individual therapy and random narcotics-use testing. Mother was unsuccessfully discharged for individual therapy due to lack of attendance. Mother missed a visit with the children on April 4, 2025 and April 18, 2025. Mother did not attend a court hearing on March 27, 2025.

17

Mother had attended her required parenting classes and had refrained from engaging in illegal activity.

The permanency report recommended that the children remain in their current placement with a relative and that mother's parental rights be terminated.

### *Foster Mother*

The children's foster mother testified that she and mother were cousins. The foster mother had adopted one of mother's other children.[13] The children got along with their sibling.

As to the children, their foster mother stated that they attended therapy twice a week based on the recommendation of their therapist.[14] The children attended school every day. Their foster mother got them ready for school and picked them up from school. The children liked school and were eager to learn, but they were behind at least a grade in their schooling. The children's foster mother encouraged them to work hard at school. The foster mother provided the children with new clothes for school.

The children's foster mother further testified that she had to teach the children appropriate personal hygiene after they entered her care. She taught them how to

---

[13] Mother asked the foster mother to take the other child before that child was born.

[14] The children were going to continue attending therapy even after trial, and the children's foster mother was committed to continuing the children's therapy.

brush their teeth appropriately and how to bathe appropriately by using soap. She also taught them how to use deodorant and lotion.

As to the children's desires, their foster mother testified that the children had said that they wanted to stay in her care. The children loved their mother but had expressed concern "about not being able to have a good home and not being able to have a decent place to live." The children's foster mother planned to adopt the children if mother's parental rights were terminated. The children were happy and safe in their foster mother's home. According to their foster mother, the children had "expressed that . . . [they now] live[d] in a decent neighborhood and they [went] to a good school and they fe[lt] safe." The foster mother's home was clean, and the children had chores to do. The children were good kids.

The children's foster mother hoped that the children would flourish, and she wanted them to "grow up to be great adults." L.L.W. wanted to be a teacher, and B.M.W. wanted to go into the military.

As to mother, the children's foster mother noted that during a virtual visit[15] about six weeks before trial, B.M.W. became upset on the call and mother hung up on the children. This caused the children to become upset. After an in-person visit with mother, B.M.W. stated that mother had told him that the foster mother was trying to take him away from mother. Following visits with mother, the children

---

[15] Mother had virtual visits with the children every other week.

19

had "a lot of reversion back with their behavior" and "[a] lot of acting out" and "[n]ot being able to concentrate." The children's foster mother did not make negative comments about mother to the children.

### Standard of Review

A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree

20

of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we

21

must hold the evidence to be legally insufficient and render judgment for the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

## Termination of Mother's Parental Rights

In a portion of her first issue, mother argues that the trial court erred in terminating her parental rights to the children because the evidence is legally and factually insufficient to support the trial court's finding that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN.

§ 161.001(b)(1)(D). In her second issue, mother argues that the trial court erred in terminating her parental rights to the children because the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the children. *See id.* § 161.001(b)(2).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the children. *See id.* § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the children as determined by the trier of fact. *See id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child[ren]'s best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## A. Endangerment

In a portion of her first issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being because "mother's continued use of illegal drugs combined with occasional displays of explosive behaviors associated

23

with her untreated mental illness playing against a backdrop of poverty-level economic misfortune d[id] not conclusively prove that the environment from which the children were removed was such that it posed a danger to their physical and emotional health." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that a parent "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] [their] physical or emotional well-being." *Id.* To "endanger" means to expose the children to loss or injury or to jeopardize their emotional or physical health. *Boyd*, 727 S.W.2d at 533 (internal quotations omitted); *see also Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The children are endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Fam. & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. However, it is not necessary that the endangering conduct be directed at the children or that the children actually suffer injury. *Id.*

Texas Family Code section 161.001(b)(1)(D) focuses on the children's surroundings and environment and requires a showing that the environment in which the children were placed endangered their physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regul. Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied); *see also In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d at 477. "Environment" refers to the acceptability of the children's living conditions as well as the conduct of a parent or other person in the home because the conduct of a parent or other person can create an environment that endangers the children's physical or emotional well-being. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (internal quotations omitted); *see also In re I.L.L.*, No. 14-09-00693-CV, 2010 WL 4217083, at *6 (Tex. App.—Houston [14th Dist.] Oct. 26, 2010, no pet.) (mem. op.); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) ("It is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, are not inherently part of the 'conditions and surroundings' of th[e] . . . home . . . ."). For instance, inappropriate, unlawful, abusive, or violent conduct by a parent or other person living in the children's home is a part of the "conditions or surroundings" of the children's home and may produce an environment that endangers their physical or emotional well-being. *In re K.C.F.*,

No. 01-13-01078-CV, 2014 WL 2538624, at *12 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) (internal quotations omitted); *In re M.R.J.M.*, 280 S.W.3d at 502 (internal quotations omitted); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Thus, although Texas Family Code section 161.001(b)(1)(D) focuses on the children's living environment, conduct of a parent or other person in the home may produce an endangering environment. *See In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at *12 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.).

The relevant time frame for establishing that a parent knowingly placed, or allowed her children to remain, in conditions or surroundings which endangered their physical or emotional well-being is before the children's removal. *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied); *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). A fact finder may infer from a parent's past conduct endangering the well-being of the children that similar conduct will recur in the future. *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.); *see also In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.) (trier of fact may measure parent's future conduct by his past conduct). DFPS does not need to establish that a parent intended to endanger the children for parental rights to be terminated based on endangerment. *In re J.H.*, 2023 WL 2169952, at *13. Texas Family Code section

26

161.001(b)(1)(D) permits termination based on a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Allowing children to be in unsanitary conditions endangers their physical and emotional well-being. *See D.K., Sr. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-13-00816-CV, 2014 WL 1910337, at *4 (Tex. App.—Austin May 9, 2014, no pet.) (mem. op.); *In re A.T.*, 406 S.W.3d 365, 371 (Tex. App.—Dallas 2013, pet. denied); *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) ("[A] child's exposure to continually unsanitary living conditions . . . may prove endangerment."). And the children's own uncleanliness constitutes "indicia which may prove endangerment." *In re P.E.W.*, 105 S.W.3d at 777; *see also In re R.D.H.*, No. 12-03-00390-CV, 2005 WL 1000617, at *4–5 (Tex. App.—Tyler April 29, 2005, no pet.) (mem. op.) (considering children were dirty and smelled poorly in holding evidence sufficient to support finding that mother placed or allowed her children to remain in environment that endangered their physical and emotional well-being); *In re H.B.*, No. 07-04-0010-CV, 2004 WL 1313764, at *2–3 (Tex. App.—Amarillo June 14, 2004, no pet.) (mem. op.) ("Continually exposing the children to unsanitary living conditions[] [and] allowing them to remain physically dirty . . . constitutes [sufficient] evidence . . . that [parent] knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered the physical and emotional well-being of [her children]."). Notably, the

27

children "need not develop or succumb to a malady due to the [unsanitary] conditions before it can be said that" they were endangered. *In re P.E.W.*, 105 S.W.3d at 777; *see also Boyd*, 727 S.W.2d at 533 (endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but not necessary that endangering conduct be directed at children or that children actually suffer injury).

Here, the record contains evidence that the children were staying in deplorable conditions before their removal from mother's care. On the day the children were removed from mother's care, they were found in a home that "looked as if it may be an abandoned home." It did not have working utilities or running water, and it was "boarded up." The condition of the home was "very bad." The inside of the home smelled "very bad of urine[] [and] feces." "The home was in complete disarray. There was mold[]. Pieces of the flooring weren't . . . intact. There w[ere] roaches everywhere . . . ." Bottles of urine were found in the bedrooms, including in the bedroom where the children were sleeping. None of the rooms in the home were clean, and they all contained feces. There was "[f]ecal matter spread over the floors, walls, and even on some furniture." "The sight and smell were overwhelming." Further inspection revealed a "considerable amount of human fecal matter . . . in the bathtub." The bedroom where the children were located had "stuff everywhere" and

was "in complete disarray."[16] *See In re A. R. R.*, No. 01-18-00043-CV, 2018 WL 3233334, at *5 (Tex. App.—Houston [1st Dist.] July 3, 2018, pet. denied) (mem. op.) (unclean home with lack of running water jeopardized children's physical and emotional well-being); *In re P.E.W.*, 105 S.W.3d at 777–78 (holding evidence sufficient to support finding parent placed children or allowed them to remain in environment that endangered them where home lacked running water, was "filthy," and contained "an odor" (internal quotations omitted)); *Phillips v. Tex. Dep't of Protective & Regul. Servs.*, 25 S.W.3d 348, 352, 354–55 (Tex. App.—Austin 2000, no pet.) (holding evidence sufficient to support finding children endangered by environment where home was "filthy," contained rodents, and had clothes and trash everywhere). Mother, at trial, conceded that the home where the children were found on November 28, 2023 was filthy.[17] *See In re E.W.*, No. 10-16-00132-CV, 2017 WL

---

[16] Photographs of the home, which showed the condition of the home and feces throughout the rooms, were admitted into evidence at trial. *See In re A.L.*, 545 S.W.3d 138, 146–47 (Tex. App.—El Paso 2017, no pet.) (noting clutter in home when determining evidence sufficient to support finding parent placed or knowingly allowed child to remain in conditions or surroundings that endangered her physical and emotional well-being); *In re M.F.*, 173 S.W.3d 220, 224–25 (Tex. App.—Dallas 2005, no pet.) (evidence sufficient to support finding mother allowed child to remain in conditions or surroundings which endangered him where home was "cluttered and full of trash").

[17] Even though mother and the children were found to be sleeping at the home, mother, at trial, testified that the children did not live at the home where they were found on November 28, 2023. However, the children reported to DFPS investigator McClinton that they lived at the address where they were found by law enforcement officers on November 28, 2023. We note that the trial court, as the fact finder, is "the sole judge of the credibility of the witnesses and the weight to give their testimony." *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st

4079713, at *2–5 (Tex. App.—Waco Sept. 13, 2017, no pet.) (mem. op.) (parents conceded home "not sanitary for the children at th[e] time" of removal); *In re A.T.*, 406 S.W.3d at 371 (parents conceded condition of room where child was living was "not good" (internal quotations omitted)).

As to the children themselves, at the time they were removed from mother's care, they were wearing dirty clothes that had holes in them and were unkempt. It appeared that the children had been "wearing [the same clothes] for a couple of days [based on] the odor" that the clothes were emitting. The children smelled of urine. The children did not look like they had been bathed recently, and their hair was tangled. When the children were bathed, dirt residue could be seen on the towels that were used. *See In re E.W.*, 2017 WL 4079713, at *5 (considering cleanliness of children in holding evidence sufficient to support finding parents placed or allowed children to remain in conditions endangering their emotional or physical well-being); *In re A.T.*, 406 S.W.3d at 371–72 (poor hygiene may constitute condition that endangers child's physical and emotional well-being); *In re C.M.W.*,

---

Dist.] 2010, pet. denied); *see also In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (appellate court may not weigh witness's credibility because it depends on appearance and demeanor which are within domain of trier of fact). And the trial court may choose to believe one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). It is also free to believe or disbelieve the testimony of any witness, and it may accept or reject all or part of a witness's testimony. *See In re C.E.S.*, 400 S.W.3d 187, 195 (Tex. App.—El Paso 2013, no pet.).

No. 01-02-00474-CV, 2003 WL 579794, at *3–4 (Tex. App.—Houston [1st Dist.] Feb. 27, 2003, no pet.) (mem. op.) (children were dirty, had poor hygiene, and offensive body odors).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). And viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being. *See id.*

Further, we conclude that the trial court could have reconciled any disputed evidence in favor of finding that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being. *See id.* And any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being. *See id.*

31

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being. *See id.*

We overrule this portion of mother's first issue.

Having held that the evidence is legally and factually sufficient to support the trial court's finding that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being, we need not address the remaining portion of mother's first issue, in which she asserts that the evidence was legally and factually insufficient to support the trial court's finding that she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being. *See id.* § 161.001(b)(1)(E); *In re A.V.*, 113 S.W.3d at 362 (only one predicate finding under Texas Family Code section 161.001(b)(1) necessary to support judgment of termination); *see also* TEX. R. APP. P. 47.1.

## B. Best Interest

In her second issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the children because most of the *Holley* factors were

32

"neutral as to termination." *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The best-interest analysis evaluates the best interest of the children. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *20 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). It is presumed that the prompt and permanent placement of the children in a safe environment is in their best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the children's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination proceedings in favor of the parent. *See In re M.A.A.*, 2021 WL 1134308, at *20; *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In determining whether the termination of mother's parental rights was in the best interest of the children we may consider several factors, including: (1) the desires of the children; (2) the current and future physical and emotional needs of the children; (3) the current and future emotional and physical danger to the children; (4) the parental abilities of the parties seeking custody of the children; (5) whether programs are available to assist those parties; (6) plans for the children by the parties seeking custody; (7) the stability of the proposed placement for the children;

33

(8) mother's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for mother's acts or omissions.[18]  *See Holley*, 544 S.W.2d at 371–72; *In re L.M.*, 104 S.W.3d at 647.  We may also consider the statutory factors set forth in Texas Family Code section 263.307.  *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

We note that the above listed factors are not exhaustive, and DFPS need not prove all factors as a condition precedent to the termination of parental rights.  *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors.").  The absence of evidence about some of the factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in a child's best interest.  *In re C.H.*, 89 S.W.3d at 27; *In re J. G. S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).  In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the children's best interest.  *See In re C.H.*, 89 S.W.3d at 27; *see also In re J. G. S.*, 574 S.W.3d at 122.

---

[18]     Much of the evidence discussed below applies to multiple factors.

The same evidence of acts and omissions used to establish grounds for termination under Texas Family Code section 161.001(b)(1) may also be relevant to determining the best interest of the children. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the children. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

### 1. The Children's Desires

When mother's parental rights were terminated, the children were nine years old. The children's foster mother testified that the children told her that they wanted to stay in her care. According to the children's foster mother, the children loved their mother but had expressed concern "about not being able to have a good home and not being able to have a decent place to live." The children were happy in their foster mother's home. They had "expressed that . . . [they now] live[d] in a decent neighborhood and they [went] to a good school and they fe[lt] safe." The children's foster mother planned to adopt the children if mother's parental rights were terminated. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (in determining

evidence sufficient to support best-interest finding, considering children bonded with foster family, foster parents wanted children to continue to live with them, and foster parents were meeting children's needs).

Although the record also reflects that the children loved mother and missed her, and mother wanted the children returned to her care, this is not dispositive of the best-interest analysis. *See In re D.R.L.*, No. 01-15-00733-CV, 2016 WL 672664, at *5 (Tex. App.—Houston [1st Dist.] Feb. 18, 2016, no pet.) (mem. op.) ("[E]ven where a child is attached to a parent, . . . [her] desire to be returned to the parent [is] not . . . dispositive of the best[-]interest analysis, especially if the parent has engaged in conduct dangerous to the child's well-being." (internal quotations omitted) (second, fourth, and fifth alterations in original)).

### 2. Current and Future Physical and Emotional Danger

#### a. *Narcotics Use*

Illegal narcotics use by a parent may constitute evidence of current and future danger to the children. *See In re D.J.G.*, No. 01-22-00870-CV, 2023 WL 3513143, at *23 (Tex. App.—Houston [1st Dist.] May 18, 2023, no pet.) (mem. op.); *In re O.J.P.*, No. 01-21-00163-CV, 2021 WL 4269175, at *19–21 (Tex. App.—Houston [1st Dist.] Sept. 21, 2021, no pet.) (mem. op.) (considering evidence of parent's narcotics use in determining current and future danger to child); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (stating "a parent's use of narcotics and its effect

36

on his or her ability to parent may qualify as an endangering course of conduct"); *In re S.R.H.*, No. 01-15-0714-CV, 2016 WL 430462, at *10–11 (Tex. App.—Houston [1st Dist.] Feb. 4, 2016, no pet.) (mem. op.) (parent's past narcotics use is indicative of instability in home environment); *Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 254–55 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (illegal narcotics use while parental rights are in jeopardy may be considered endangering course of conduct critical to finding that termination is in child's best interest).

The record shows that mother repeatedly tested positive for narcotics use during the pendency of the case. For instance, on April 16, 2024, mother tested positive for marijuana use by hair-follicle analysis; on October 10, 2024, mother tested positive for methamphetamine use by hair-follicle analysis and for marijuana use by urinalysis; on January 17, 2025, mother tested positive for marijuana and cocaine use by hair-follicle analysis and marijuana use by urinalysis; on February 24, 2025, mother tested positive for marijuana use by urinalysis; and on April 17, 2025, mother tested positive for marijuana and cocaine use by hair-follicle analysis. Mother also refused to submit to narcotics-use testing on November 14, 2024 and February 18, 2025.[19] *See In re Z.J.B.*, No. 14-18-00759-CV, 2019 WL 347474, at

---

[19] Mother's FSP informed her that if she missed a required narcotics-use test, it would be considered a positive result.

*7 (Tex. App.—Houston [14th Dist.] Jan. 29, 2019, pet. denied) (mem. op.) (parent's positive narcotics-use tests and failure to appear for other narcotics-use tests weighed in favor of trial court's best-interest finding); *In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.) (parent's "refusal to submit to the drug test may be treated by the [fact finder] as if he had tested positive for drugs"); *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (fact finder could reasonably infer parent's failure to complete scheduled narcotics-use screenings indicated she avoided testing because she had used narcotics); *see also In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at *7 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.) ("Parental [narcotics] use remains endangering conduct even if the child was not in the parent's custody when the [narcotics] use occurred.").

b.      *Violence and Criminal Conduct*

Violence in the home undermines the safety of the home environment and is relevant when considering the best interest of the children. *See In re L.W.*, 2019 WL 1523124, at *19; *In re A.K.*, Nos. 07-17-00353-CV, 07-17-00354-CV, 2018 WL 912703, at *5 (Tex. App.—Amarillo Feb. 15, 2018, pet. denied) (mem. op.). And evidence of a parent's past misconduct can be used to measure a parent's future conduct. *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied);

*Banargent v. Brent*, No. 14-05-00574-CV, 2006 WL 462268, at *2 (Tex. App.—Houston [14th Dist.] Feb. 28, 2006, no pet.) (mem. op) (past violence can support finding of likely future violence).

Further, a parent's criminal history is relevant in analyzing the present and future emotional and physical danger to the children and whether a parent is capable of providing a safe and stable home for her children. *See In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *18–19 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.); *In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (evidence of parent's criminal history may support trial court's finding termination of parental rights in children's best interest). Notably, "[a]s a general rule, conduct that subjects [the] child[ren] to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child[ren]." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Here, the record shows that mother was previously convicted of the second-degree felony offense of indecency with a child and her punishment was assessed at confinement for two years. *See* TEX. PENAL CODE ANN. § 21.11(a), (d). Mother was also required to register as a sex offender based on this conviction, and she testified that she had been incarcerated two times for not "up-to-dating [her]

39

address," as required based on her sex-offender status. *See In re R.W.*, 129 S.W.3d at 739.

Further, on the day that the children entered DFPS's care, mother was arrested for the offense of terroristic threat. The indictment alleged that on November 28, 2023, mother intentionally and knowingly harmed and threatened to harm, the complainant, a law enforcement officer, "by an unlawful act, namely an assault, in retaliation for and on account of the service and status of [the complainant] as a public servant." *See* TEX. PENAL CODE ANN. § 22.07.

As to the incident giving rise to mother's arrest, Officer Shaw testified that when law enforcement officers came in contact with mother on November 28, 2023, she was behaving very erratically. She did not want officers "in her home" or "in th[e] room" where she was sleeping. She yelled at the officers and assaulted some of the officers.[20] The children were present during the incident and witnessed mother's behavior. *See, e.g., In re M.Y.G.*, 423 S.W.3d 504, 507, 514 (Tex. App.—

---

[20] We note that mother testified that she threatened her ex-boyfriend, rather than law enforcement officers. *See In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *24 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) ("[T]o the extent that there are discrepancies in the record, the trial court, as the fact finder, is the sole judge of the credibility of the witnesses and the weight to give their testimony. . . . [T]he trial court may choose to believe one witness and disbelieve another. It is also free to disbelieve the testimony of any witness, and it may accept or reject all or part of a witness's testimony." (internal quotations and citations omitted)).

Amarillo 2014, no pet.) (considering children present in home when parents were arrested by law enforcement in determining termination in best interest of children).

Ultimately, during the pendency of this case, mother was convicted of the misdemeanor offense of terroristic threat, and her punishment was assessed at confinement for ten months. Mother spent time in jail during this case. *In re K.S.*, 420 S.W.3d 852, 856 (Tex. App.—Texarkana 2014, no pet.) ("[The] past is [a] prologue[;] there is a great likelihood that [a parent's] conduct w[ill] continue into the future. Actions speak louder than words.").

### 3. Current and Future Physical and Emotional Needs, Parental Abilities, and Stability of Proposed Placement

#### a. *Children's Needs*

The record is clear that the children were behind in school when they entered DFPS's care. Mother acknowledged that when the children were in her care, they did not attend school regularly, and at the time that the children were removed from mother's care, they were not enrolled in school. The children repeated the first grade because mother had not taken them to school on a consistent basis. Further, when the children entered DFPS's care, they could not count or spell their own names. Mother testified that she was not aware that the children were struggling in school. *See, e.g.*, *In re G.M.D.*, Nos. 01-25-00609-CV, 01-25-00940-CV, 2026 WL 233139, at *14 (Tex. App.—Houston [1st Dist.] Jan. 29, 2026, no pet. h.) (mem. op.) (parent's "neglect of the children's educational needs, as reflected by evidence that

41

[child] had sixteen consecutive absences from school, [was] indicative of [parent's] poor parenting abilities and her inability to meet the children's needs"); *In re P.N.T.*, 580 S.W.3d 331, 358 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (considering parents were not meeting child's educational needs in determining best interest); *In re S.P.M.*, No. 07-13-00282-CV, 2014 WL 241796, at *7–8 (Tex. App.—Amarillo Jan. 21, 2014, no pet.) (mem. op.) (considering "parents' poor performance in the past regarding school attendance" in holding sufficient evidence to support best-interest finding).

Since entering DFPS's care, the children were doing well academically, although they were a grade behind in their schooling. At the children's current school, they received tutoring services and both children had a paraprofessional in the classroom to assist them with reading and math. L.L.W. continued to struggle in school but had shown improvement with the assistance of her foster mother and teachers. *See In re B.M.C.*, No. 01-16-00300-CV, 2016 WL 5787286, at *7 (Tex. App.—Houston [1st Dist.] Oct. 4, 2016, pet. denied) (mem. op.) (considering that children attended school while in DFPS's care). The children had been diagnosed with ADHD and were prescribed medication.

The children's foster mother testified that the children attended school every day, and she got them ready for school and picked them up from school. According to their foster mother, the children liked school and were eager to learn. The foster

42

mother encouraged them to work hard at school, and she provided them with new clothing for school.

Additionally, the record reflects that the children's foster mother took care of the children's needs while they were in her care. She took them to doctor appointments and dentist appointments. *See In re M.A.A.*, 2021 WL 1134308, at *23 (child's basic needs include medical and dental care); *see also* TEX. FAM. CODE ANN. § 263.307(b)(12)(A) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrated adequate parenting skills, such as providing health care).

The children also attended therapy twice a week, which their foster mother planned to continue until the children's therapist said that it was no longer needed. *See In re K.A.C.*, 594 S.W.3d 364, 376 (Tex. App.—El Paso 2019, no pet.) (considering child's foster placement was able to provide for child's therapeutic needs). While in her care, the children's foster mother taught the children about personal hygiene. She taught them how to brush their teeth appropriately and how to bathe properly using soap. She also taught them how to use deodorant and lotion. *See, e.g., In re Z.T.*, No. 06-20-00023-CV, 2020 WL 4494648, at *3 (Tex. App.— Texarkana Aug. 5, 2020, pet. denied) (mem. op.) (foster parents taught child "basic hygiene skills").

b.    *Mother's Ability to Care for Children*

The children's need for a safe and stable home is the paramount consideration in assessing the best interest of the children. *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.); *Adams v. Tex. Dep't of Fam. & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (in children's best interest to be raised in consistent, stable, and nurturing environment).

As detailed above, at the time the children were removed from mother's care, law enforcement officers found them staying in deplorable conditions.  Law enforcement officers found the children and mother in a home that "looked as if it may be an abandoned home."  It did not have working utilities or running water, and it was "boarded up."  The condition of the home was "very bad."  The inside of the home smelled "very bad of urine[] [and] feces."  "The home was in complete disarray.  There was mold[].  Pieces of the flooring weren't . . . intact.  There w[ere] roaches everywhere . . . ."  Bottles of urine were found in the bedrooms, including in the bedroom where the children were sleeping.  None of the rooms in the home

44

were clean, and they all contained feces. There was "[f]ecal matter spread over the floors, walls, and even on some furniture." "The sight and smell were overwhelming." Further inspection revealed a "considerable amount of human fecal matter . . . in the bathtub." The bedroom where the children were located had "stuff everywhere" and was "in complete disarray." *See In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *21–23 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) (considering poor physical condition of parent's home in holding evidence sufficient to support trial court's best-interest finding); *In re A. R. R.*, 2018 WL 3233334, at *5 (unclean home that lacked running water jeopardized children's physical and emotional well-being); *In re A.L.*, 545 S.W.3d 138, 148 (Tex. App.—El Paso 2017, no pet.) (home's unsanitary and unsafe conditions, including clutter, relevant in determining emotional and physical needs of child and emotional and physical danger to child); *see also* TEX. FAM. CODE ANN. § 263.307(b)(12)(D) (considering whether parent demonstrates adequate parenting skills, including providing "a safe physical home environment"). Although mother testified at trial that the children did not live at the home where they were found by law enforcement officers, the children reported that they did. *See In re K.S.O.B.*, 2019 WL 1246348, at *24 (trial court is "free to believe or disbelieve the testimony of any witness, and it may accept or reject all or part of a witness's testimony").

45

Additionally, at the time the children were removed from mother's care, they smelled of urine and wore dirty clothes that contained holes. The children were unkempt and visibly dirty, requiring bathing immediately. *See In re A.T.*, 406 S.W.3d at 371–72 (poor hygiene may constitute condition that endangers child's physical and emotional well-being); *In re Z.G.*, No. 11-11-00078-CV, 2012 WL 745090, at *4 (Tex. App.—Eastland Mar. 8, 2012, no pet.) (mem. op.) (parent unable to provide safe environment for children where children's hygiene was poor); *In re C.M.W.*, 2003 WL 579794, at *5 (children's basic needs include cleanliness and clothing); *see also In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (fact finder may infer from parent's past inability to meet child's physical and emotional needs inability or unwillingness to meet child's needs in future).

At the time of trial, mother testified that she was living in a two-bedroom house with a male roommate. Mother's name was not on the lease agreement. Mother slept in one bedroom, and her roommate slept in the living room. According to DFPS caseworker Pancham, little information about mother's roommate had been provided to DFPS, so DFPS was unable to determine if it was safe for the children to live in a home with him. When Pancham visited mother's home, there was a package on the porch that smelled of marijuana. The second bedroom in the house appeared to have "excess stuff" in it and could not accommodate two nine-year old

46

children. *See In re G.M.G.*, 444 S.W.3d at 60 (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs); *Adams*, 236 S.W.3d at 280 (in children's best interest to be raised in consistent, stable, and nurturing environment); *see also In re I.L.G.*, 531 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (stability of proposed placement important consideration in determining whether termination of parental rights in children's best interest).

c.      *Current Placement*

The children's foster mother is mother's cousin and had previously adopted the children's younger sibling. The children got along with their sibling. The children felt happy and safe in their foster mother's care. The children had "expressed that . . . [they now] live[d] in a decent neighborhood and they [went] to a good school and they fe[lt] safe." The foster mother's home was clean, and the children participated in chores. *See In re J.M.*, 156 S.W.3d 696, 708 (Tex. App.—Dallas 2005, no pet.) (holding evidence sufficient to support trial court's finding termination of parental rights in child's best interest where "[t]he evidence show[ed] the foster parents' home [was] stable").

The children's foster mother testified that she wanted to adopt the children, and she hoped that the children would flourish. *See In re T.M.R.*, No. 13-21-00144-CV, 2021 WL 4998438, at *7 (Tex. App.—Corpus Christi–Edinburg

Oct. 28, 2021, no pet.) (mem. op.) ("A factfinder may consider the consequences of [the] failure to terminate parental rights and may also consider that the child's best interest may be served by termination so that adoption may occur."); *In re L.W.*, 2019 WL 1523124, at *23 (in holding evidence sufficient to support trial court's best-interest finding, considering children were placed in adoptive home with foster parents who wanted children to continue living with them). She wanted the children to "grow up to be great adults." L.L.W. wanted to be a teacher, and B.M.W. wanted to go into the military.

The children's foster mother stated that the children had told her that they wanted to stay in her care. The children loved their mother but had expressed concern "about not being able to have a good home and not being able to have a decent place to live." DFPS caseworker Pancham confirmed that he had visited the children in their current placement, and they seemed happy. The children's foster mother was meeting their physical and emotional needs.

### 4. Mother's Acts and Omissions

A parent's failure to comply with her FSP supports a finding that termination of her parental rights is in the best interest of the children. *In re D.S.D.*, No. 01-24-00743-CV, 2025 WL 898322, at *22 (Tex. App.—Houston [1st Dist.] Mar. 25, 2025, pet. denied) (mem. op.); *see also In re J.-M.A.Y.*, Nos. 01-15-00469-CV, 01-15-00589-CV, 2015 WL 6755595, at *7 (Tex. App.—Houston [1st Dist.] Nov.

5, 2015, pet. denied) (mem. op.) ("[A] factfinder may infer from a parent's failure to take the initiative to complete the services required to regain possession of her children that she does not have the ability to motivate herself to seek out available resources needed now or in the future.").

The record is clear that mother did not complete all the requirements of her FSP. *See In re M.L.H.*, No. 04-21-00408-CV, 2022 WL 526501, at *4 (Tex. App.—San Antonio Feb. 23, 2022, pet. denied) (mem. op.) (holding evidence legally and factually sufficient to support trial court's best-interest finding where parent "engaged in her service plan, [but] she failed to successfully complete it"); *In re A.L.W.*, No. 01-14-00805-CV, 2015 WL 4262754, at *12 (Tex. App.—Houston [1st Dist.] July 14, 2015, no pet.) (mem. op.) (fact finder could infer from parent's failure to take initiative to complete services required to regain possession of her children that parent did not have ability to motivate herself to seek out available resources needed now or in future); *In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (failure to comply with court-ordered service plan for reunification with the child relevant to best-interest finding).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Viewing the evidence in a neutral light, we

conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of the children. *See id.* We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of mother's parental rights was in the children's best interest, or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of the children. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in the best interest of the children. *See id.*

We overrule mother's second issue.

## Conclusion

We affirm the order of the trial court.


Kristin Guiney
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.